Filed 9/8/23; Modified and Certified for Partial Pub. 10/4/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MARINA COAST WATER DISTRICT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF MONTEREY et al., <br><br> Defendants and Appellants; <br><br> CALIFORNIA-AMERICAN WATER COMPANY, <br><br> Real Party in Interest and Appellant. | H049146 & H049170 <br> (Monterey County <br> Super. Ct. No. 19CV003305) |

California-American Water Company (Cal-Am), an investor-owned utility that supplies water to much of the Monterey Peninsula, seeks to implement its Monterey Peninsula Water Supply Project (Water Supply Project) to comply with a state order to cease its decades-long overuse of other water sources. Crucial to the Water Supply Project are (1) construction of the desalination plant here at issue in unincorporated Monterey County and (2) the drilling of wells in coastal land administered by the City of Marina (the City) to supply the plant. We are called to review the approval of

construction of the desalination plant by the County of Monterey through its Board of Supervisors (collectively, the County).

The Water Supply Project is intended to increase the region's supply of potable water by using the wells to draw unusable seawater and brackish water[1] from coastal aquifers in the Salinas Valley Groundwater Basin (Salinas Basin),[2] and routing it by pipeline to the plant, where it will be desalinated. As a hydrological matter, whether the Water Supply Project will serve its purpose depends on the nature of the water the planned intake wells draw from the "capture zone"—the volume of aquifer that contributes the water extracted by the wells—and, by extension, on the replenishment, or recharge, of the capture zone predominantly by ocean water and not fresh water from inland portions of the Salinas Basin. As a legal matter, realization of the multijurisdictional Water Supply Project depends on the approval of its many component parts by dozens of governmental agencies.

Acting as a lead agency under the California Environmental Quality Act (CEQA; see Pub. Resources Code, § 21050),[3] the California Public Utilities Commission (CPUC) undertook environmental review of Cal-Am's proposal for the Water Supply Project. The CPUC ultimately certified a final EIR and granted Cal-Am a Certificate of Public Convenience and Necessity authorizing commencement of a scaled-down version of Cal-

---

[1] For consistency, our terminology tracks that of the final environmental impact report (EIR): "[S]eawater is defined as water that originated in the ocean, identified as containing 33,500 mg/L TDS [total dissolved solids], which represents current salinity levels in Monterey Bay; brackish water is a combination of seawater and fresh water with TDS concentrations between 500 mg/L and 33,500 mg/L; and fresh water is that which originated in a groundwater basin through precipitation or rivers and streams and contains TDS concentrations of less than 500 mg/L."

[2] As explained in the final EIR, "[a] groundwater basin is an aquifer or a stacked series of aquifers with reasonably well-defined boundaries in a lateral direction and a definable bottom."

[3] Undesignated statutory references are to the Public Resources Code.

Am's proposal, subject to Cal-Am's obtaining necessary approvals from various responsible agencies.

Among the various responsible agencies having jurisdiction over local components of the Water Supply Project, the City denied Cal-Am coastal development permitting to install the intake wells. While Cal-Am's appeal from the City's denial was pending before the California Coastal Commission, the County approved Cal-Am's application for a permit (the Permit) to construct the desalination plant and associated facilities in an unincorporated part of Monterey county.

Marina Coast Water District (MCWD) challenged the County's approval of the Permit by filing a petition for writ of mandate and a complaint for declaratory relief. MCWD argued, among other things, that the County: (1) violated CEQA by (a) failing to prepare a subsequent or supplemental EIR; and (b) adopting a statement of overriding considerations that was unsupported by substantial evidence in the record; and (2) violated its own general plan by approving a project that lacked a long-term sustainable water supply and adequate water supply system.

The trial court granted MCWD's writ petition in part and denied it in part. The court ruled that the County was not required to prepare a subsequent or supplemental EIR and did not violate its own general plan, but unlawfully relied on the water-related benefits of the desalination plant in its statement of overriding considerations without addressing the uncertainty as to the water supply introduced by the City's denial of the coastal development permit. The court issued a peremptory writ of mandate setting aside the County's approval of the Permit and entered judgment on April 29, 2021. The County and Cal-Am timely appealed and MCWD cross-appealed.

On the County and Cal-Am's appeal, we conclude that the County's statement of overriding considerations was supported by substantial evidence and any remaining deficiency in the statement as an informational document was not prejudicial. On

3

MCWD's cross-appeal, we are not persuaded that the trial court erred in rejecting MCWD's other contentions.  Accordingly, we reverse the judgment.

## I.     BACKGROUND

**A.     *Historical Sources of Water Supply***

Water supply has been a concern on the semi-arid Monterey Peninsula for decades, given the frequency of drought conditions.

One source of water on the peninsula is the Carmel River system.  Construction of the San Clemente Dam on the Carmel River in 1921 formed the San Clemente Reservoir, until the dam's removal in 2015.  River water diverted at the dam was the sole water supply for the peninsula until the 1940's.  In 1949, Los Padres Dam, which forms Los Padres Reservoir, was built upstream of the San Clemente Dam to provide a second reservoir and control water flowing into the San Clemente Reservoir.  Starting in the 1940's and continuing into the 1990's, production wells installed along the river in the Carmel Valley Alluvial Aquifer became another means of collecting Carmel River water.

The Seaside Groundwater Basin (Seaside Basin) is another source of water for the peninsula.  Groundwater pumping from aquifers in the Seaside Basin has exceeded recharge.[4]

The Salinas Basin is north of the Seaside Basin.  The Salinas Basin is hydrologically connected to the Monterey Bay by ocean outcrops in the Salinas Basin's 180-Foot Equivalent (FTE)[5] and 400-Foot Aquifers. (See Appendix 1, *post*.)  Due to this connection, the ocean is a constant source of pressure for aquifers in the Salinas Basin.

---

[4] An aquifer may be recharged by surface water or from adjacent aquifers.  Along the coast, recharge may also be from the ocean.  When the ocean recharges an aquifer, seawater enters the ocean to mix with the fresh groundwater, causing seawater intrusion.

[5] The 180-Foot Aquifer and 180-FTE Aquifer are distinguished by the "different depositional process" that produced the terrace deposits of which the aquifers are composed, but both aquifers are "at the same depth interval and . . . considered to be

4

Before wells extracted water from the Salinas Valley, the seaward gradient of inland groundwater[6] effectively limited seawater intrusion into the coastal aquifers of the Salinas Basin. Surface water from the Salinas Valley watershed would recharge the aquifers and counter pressure from seawater, maintaining dynamic equilibrium at the interface.

Development of the Salinas Valley brought water supply wells that pumped water from the Salinas Basin. In the Salinas Valley, groundwater is primarily pumped from the 180-Foot and 400-Foot Aquifers. As groundwater extraction exceeded the natural recharge from the watershed, the reduced water table in the coastal aquifers leveled and eventually reversed what had been a natural seaward gradient of inland groundwater: as water pressure "on the inland side of the seawater intrusion front" diminished, the resulting pressure imbalance allowed seawater to intrude.

Seawater intrusion in the Salinas Basin was first documented in 1946. Over time, the seawater intrusion front has migrated further inland in both the 180-Foot and 400-Foot Aquifers. As a result, groundwater users in the Marina/Castroville area have been forced to drill and develop wells below the 400-Foot Aquifer.

Restrictions on drilling groundwater wells and extracting groundwater from areas affected by seawater intrusion have been adopted to reduce the landward advance of the seawater intrusion front.

B.      *Cal-Am's Water Shortage*

Cal-Am is a CPUC-regulated investor-owned water utility that has supplied much of the Monterey Peninsula since 1966. MCWD is a publicly owned county water district

connected and equivalent." Because "these units correlate," the terms are sometimes used interchangeably.

[6] A "seaward gradient" is a hydraulic gradient in which inland groundwater moves towards the sea.

that was formed in 1960 and serves the City and the community at the former Fort Ord Army Base.

By 1995, Cal-Am relied on the Carmel River system to meet its water demand, including surface water diversions from the San Clemente and Los Padres Reservoirs and wells pumping the Carmel Valley Alluvial Aquifer; the wells alone accounted for 70 percent of Cal-Am's supply. Also in 1995, the State Water Resources Control Board (Water Board) concluded that although Cal-Am had been diverting an average of over 14,000 acre-feet per year (afy) from the Carmel River system, it had a legal right to only 3,376 afy. The Water Board ordered Cal-Am to replace its unlawful diversions of more than 10,000 afy per year by obtaining additional rights to Carmel River water, tapping other sources of water, or other actions, such as conservation. Cal-Am's overuse of Carmel River water further subjected it to federal prosecution under the Endangered Species Act for unlawful takings of threatened species inhabiting the river.

Cal-Am's other principal source of supply is the Seaside Basin. But in 2006, the Monterey County Superior Court issued a decision adjudicating the water rights of the various parties who draw groundwater from the Seaside Basin to protect the basin from long-term damage associated with overdraft, including seawater intrusion. To that end, the court identified the natural safe yield for the basin and each of the basin's subareas, allocated water rights among the parties that would diminish incrementally over time until total withdrawals ceased exceeding the natural safe yield, and required replenishment of withdrawals in excess of the natural safe yield. The court order limits Cal-Am's eventual allocation of water from the Seaside Basin to 1,474 afy and requires Cal-Am to replenish prior excess withdrawals at a rate of 700 afy over 25 years.

In 2009, the Water Board issued a cease and desist order in which it ordered Cal-Am to terminate all unauthorized diversions from the Carmel River no later than December 31, 2016. In 2016, the Water Board extended the deadline for Cal-Am to terminate all unauthorized diversions to December 31, 2021. The 2016 revised cease and

desist order allowed Cal-Am to divert 8,310 afy through 2021 but established annual milestones for "demonstrat[ing] tangible progress in developing an alternative water supply"; failure to meet an annual milestone would reduce Cal-Am's annual diversion limit by 1,000 acre-feet.

## C.    *The Water Supply Project*

In 2012, Cal-Am began pursuing the Water Supply Project, the third iteration of its pursuit of desalination.[7]  The Water Supply Project is intended to enable Cal-Am to stop exceeding its share of water from the Carmel River and Seaside Basin while providing sufficient water to its customers.

The Water Supply Project would draw water, primarily seawater, through slant wells at a CEMEX sand mining site in the City's coastal zone at the western edge of the Salinas Basin.  The proposed slant wells would draw water through screens at depths corresponding to the Dune Sands Aquifer and the 180-FTE Aquifer, from about 30 to 200 feet below mean sea level.[8]  (See Appendix 2, *post*.)  Determining the "Ocean Water

---

[7] In 2010, the CPUC, in lieu of approving Cal-Am's original Coastal Water Project, approved the alternative "Regional Desalination Project," to be implemented jointly by Cal-Am, MCWD, and the Monterey County Water Resources Agency.  (See *California-American Water Co. v. Marina Coast Water Dist.* (2016) 2 Cal.App.5th 748, 753 (*Cal-Am*).)  In issuing Cal-Am a Certificate of Public Convenience and Necessity for the Regional Desalination Project, the CPUC "approved a settlement agreement in which the Marina Coast Water District would own the desalination plant, Cal-Am would own the associated transportation and system facilities, and the Monterey County Water Resources Agency would own the wells to pump seawater from the Salinas Valley Groundwater Basin."  Cal-Am later withdrew its support for the Regional Desalination Project and prevailed in an action to invalidate the underlying agreements, based on the conflict of interest represented by MCWD's retention of a member of the Monterey County Water Resources Agency's board of directors as a paid consultant.  (*Cal-Am*, *supra*, 2 Cal.App.5th at p. 752.)

[8] The Dune Sand Aquifer is a shallow aquifer and has not been used as a source of potable water supply in the region primarily because of its limited size.  The Dune Sand Aquifer directly overlies and is in hydraulic continuity with the 180-FTE Aquifer.  (See Appendix 1, *post*.)

7

Percentage"—the percentage of seawater in the mix drawn by the intake wells—was a concern beginning in the early planning stages of the Water Supply Project. The inverse of the Ocean Water Percentage—the percentage of the feedwater that is not ocean water—is the "return water": water that Cal-Am must return to Salinas Basin water users.

As proposed to the CPUC and discussed in the March 2018 final EIR, the project would include, among other things, 10 subsurface slant wells, a desalination plant with a capacity of 9.6 million gallons per day (mgd),[9] a source water pipeline that would convey the water from the wells to a desalination plant, treated water storage tanks, and brine storage and conveyance facilities. At that size, the Water Supply Project would produce approximately 10,750 afy. But Cal-Am included an alternative variant featuring a smaller capacity desalination plant served by fewer intake wells, to be supplemented by a water purchase agreement for 3,500 afy of recycled water from the Pure Water Monterey Groundwater Replenishment Project (Pure Water Monterey).

**D.** *Pure Water Monterey*

Pure Water Monterey is a distinct effort "to create a reliable source of water supply to replace existing water supply sources for the Monterey Peninsula in northern Monterey County" pursued by Monterey One Water in partnership with the Monterey Peninsula Water Management District. As initially approved by the Monterey One Water board of directors in 2015, Pure Water Monterey included a 4-mgd capacity "Advanced Water Purification Facility" for treatment and production of purified recycled water that would be injected into the Seaside Basin. Cal-Am entered an agreement to purchase 3,500 afy of water from the project, which Cal-Am would extract through its existing wells.

---

[9] A steady flow of one mgd would equate to about 1,121 afy.

8

In October 2017, the Monterey One Water board of directors approved expansion of the treatment facilities to a 5-mgd capacity to enable delivery of 600 afy of purified recycled water to MCWD, sourced from MCWD's municipal wastewater.

By May 2018, Monterey One Water and Monterey Peninsula Water had developed a conceptual plan to expand the project from 5 mgd to 7 mgd. At that time, Monterey One Water authored a "[p]rogress [r]eport" stating that the environmental review process had "commenced with the development of a project description" and that 30 percent of the design work for the expansion had been completed but that a supplemental EIR would need to be prepared and reviewed. According to the report, the "CEQA review process could be initiated at any time."

E.     *CPUC Lead Agency Approval*

In 2018, acting as the CEQA lead agency (§ 21067), the CPUC certified the final EIR (§ 21061) for the Water Supply Project, including for use by responsible agencies (§ 21069) in considering subsequent approvals, and approved the Water Supply Project at a reduced 6.4 mgd production capacity.[10] Even so, the CPUC acknowledged that "Cal-Am's right to construct the [Water Supply Project] . . . should be subject to all other applicable federal, state and local permitting processes and approvals." The California Supreme Court denied MCWD's petition for review of the CPUC decision.

---

[10] The lead agency is the "public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067.) A responsible agency is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (§ 21069.) The lead agency has a primary role in assessing whether an EIR is required and in preparing and certifying the EIR. (See §§ 21080.1, 21080.4, 21082.1, 21082.2, 21082.4.) A responsible agency bears "responsibility for mitigating or avoiding only the direct or indirect environmental effects of those parts of the project which it decides to carry out, finance, or approve." (Cal. Code Regs., tit. 14, § 15096, subd. (g)(1); see also *id*., § 15041, subd. (b).) Subsequent references to "Guidelines" are to the CEQA guidelines found in the California Code of Regulations, title 14, section 15000 et seq.

### 1. *CPUC's Consideration of Issues Related to Source Water*

A primary CPUC focus was determining whether, by withdrawing water from coastal aquifers in the Salinas Basin, the Water Supply Project would exacerbate seawater intrusion in the Salinas Basin and harm other users, particularly MCWD. Aside from the matter's intrinsic importance, the CPUC was following an advisory Water Board legal opinion, provided at the CPUC's request, that Cal-Am's legal right to withdraw groundwater from the basin was contingent upon Cal-Am demonstrating that the project "will not harm or cause injury to other basin users."

Based on water quality testing and modeling, the CPUC determined that the wells "would initially extract the ambient brackish groundwater" in the capture zone—the result of "decades of . . . seawater intrusion" in the affected aquifers. Based on the proposed location of the wells, the configuration of the capture zone, and measurement and modeling of the groundwater gradient, the CPUC determined that "over time, the source water supplied by [the] capture zone would be replaced by seawater."

The Water Board opined that although Cal-Am did not need to establish a water right to extract the seawater element of the brackish groundwater, Cal-Am needed to establish an appropriative right to the portion of the feedwater that originated from the Salinas Basin by showing that its extraction would not harm existing basin users. The CPUC was satisfied that the project would not harm existing basin users because the brackish feedwater was neither used nor useful in its existing state, the project would not draw freshwater on its own, and Cal-Am would "return" to the Salinas Basin desalinated water in an amount equal to the volume of freshwater included in withdrawn brackish water. Pursuant to a settlement agreement with the Monterey County Water Resources Board, this "would be accomplished by supplying return water to the Castroville Community Services District for municipal water supply (in lieu of groundwater pumping from the Salinas Valley Groundwater Basin) and also to the Castroville Seawater Intrusion Project. The return water component of the project would ensure that

10

the Salinas Valley Groundwater Basin is made whole with regards to any fresh water withdrawn by the project supply wells and that the project satisfies" other legal obligations.[11]

The CPUC's decision was reached over the MCWD's strenuous opposition. Prior to the issuance of the final EIR in March 2018, the CPUC considered a comment from MCWD that appended, among other things, (1) memos from Hopkins Groundwater Consultants; (2) memos from EKI Environment & Water, Inc.; and (3) and the preliminary interpretation of a 2017 Airborne Electromagnetics (AEM) study conducted by a team led by Dr. Rosemary Knight. Further, in approving the project, the CPUC considered further comments responsive to the EIR, including additional materials from all three sources.

Hopkins opined that recent data showed recharge from the Salinas River had created a seaward gradient "toward the coastline in the Marina Subarea of the" Salinas Basin.[12] This means that, in at least some portions of the Marina Subarea, there was "a groundwater gradient that moves water from the river area of recharge toward the coastline." Responding to these and related opinions, the Hydrogeological Working Group (HWG) disputed the foundation for Hopkins's opinion that a seaward gradient

---

[11] In opposing the Water Supply Project, the City noted that it is "a disadvantaged community under federal, state and local laws and programs" due to "its demographic and economic profile" and argued that " '[t]he extraction of groundwater by Cal-Am to create a water source for other communities by stealing from Marina's sole source of water is a classic example of environmental injustice.' "

[12] Hopkins used the term "Marina Subarea" to refer to "(1) that portion of the 180/400 Foot Aquifer Subbasin of the [Salinas Basin] located south of the Salinas River plus (2) the northwest portion of the Monterey Subbasin that would be impacted by the proposed slant well pumping on the CEMEX property." Although the "Marina Subarea" is not formally recognized, Hopkins opined that "it contains highly complex hydrogeological conditions . . . and is the area that would be directly impacted by the proposed project feed water pumping."

11

existed in at least part of the relevant area and alternatively argued that such data was immaterial because it followed "a record wet year" whereas long-term data indicated ongoing seawater intrusion. HWG opined that even in a flat gradient scenario an "extremely high percentage of water entering [Water Supply Project] wells still originates from the ocean" because the ocean is "a massive recharge boundary."

Separately, in the preliminary analysis of the AEM study, Knight concluded that there was a " 'sizable isolated lens of freshwater' in the Dune Sand and 180-FTE Aquifer[s]" such that "the presumption of saltwater intrusion in this area appears incorrect." But the CPUC questioned the utility of AEM data and, in any event, opined that pockets of inland groundwater were of "minor consequence" because the AEM survey results showed a "band of highly brackish to saline groundwater along the coast where the [MPWSP] slant wells would be extracting water" and less-intruded inland water "would not be drawn into and would not become source water for" the slant wells.

In approving the Water Supply Project, the CPUC responded to the final AEM study and other comments on the final EIR. The CPUC concluded that "[t]he ocean is a constant-head recharge boundary; in other words, the ocean is an area from where the aquifers are consistently replenished. Most of the water drawn into the slant wells would come from the ocean. The comments on the Final EIR/EIS assert that if the current inland groundwater gradient were reduced (got flatter) or reversed (started flowing toward the ocean) in the future, the project would begin to draw fresh water from areas inland of the coast. However, the analyses presented in the comments misrepresent the conditions because they disregard or understate the presence and influence of the ocean, a substantial recharge boundary, and overestimate the extent that groundwater would be captured from inland sources." Even assuming a reversed gradient, the CPUC stated that "the volume of inland water arriving at the slant wells would be far less and take more time than it would for the higher volume of seawater to reach the slant wells" such that "[m]ost of the water entering the slant wells would still come from the ocean."

12

Quoting from a July 2013 Water Board analysis, the CPUC allowed that, " '[i]n the long[ ]term, the situation may be altered and the source of water drawn from the extraction well system may need to be reevaluated under the following conditions: (1) if pumping of water from inland areas is reduced to the point that the groundwater system is in equilibrium, and (2) the pumping depressions are reduced such that there is no longer a landward gradient.' " However, the CPUC stated that "it would be total speculation to believe[] that the existing groundwater gradient in the Dune Sand and 180-Foot Aquifers could be reversed within the life of the project" and that "achieving groundwater elevations in the [Salinas Basin] necessary to reverse (or even flatten) the existing inland gradient would require concerted basin-wide efforts to reduce pumping and increase recharge inland of the coast."[13]

### 2. *CPUC's Consideration of Pure Water Monterey*

In its March 2018 final EIR, the CPUC considered its 2016 approval of Cal-Am's water purchase agreement with Pure Water Monterey for 3,500 afy as a reason to approve only a 6.4 mgd desalination plant, rather than a 9.6 mgd desalination plant. The CPUC considered but rejected scenarios projecting further expansion of Pure Water Monterey "as a stand-alone alternative to the [Water Supply Project] because it would not provide enough water to meet the basic project objectives." The CPUC concluded that even under the maximum expansion scenario of an additional 3,570 afy from Pure Water Monterey to Cal-Am, this would be insufficient to meet the estimated demand of 14,000 afy or Cal-Am's obligation to replenish the Seaside Basin. The CPUC further determined that this would not "establish water supply reliability," diversify water supply sources, or offer a drought-resistant option, as would the desalination plant. Moreover, "[Pure Water Monterey] expansion alone increases the risk that sufficient supply would

---

[13] The Water Supply Project source water would be drawn from the Dune Sand and 180-Foot aquifers.

not be available to meet peak hour, day, and month demands, particularly during drought years."

Nevertheless, the CPUC required Cal-Am to submit an advice letter as to whether to pursue a water purchase agreement for additional water supply to be provided by Pure Water Monterey expansion. "To the extent Cal-Am files (or the [CPUC] directs Cal-Am to file) an application seeking approval of a PWM expansion WPA, . . . [t]he application will be considered only to the extent the desalination plant authorized . . . is delayed to the point that sufficient source water capacity is . . . likely . . . to be unavailable" beyond the cease and desist order's December 31, 2021 deadline.

## F.    *Attempts to Secure Slant Well Approval*

The Water Supply Project subsurface wells would be slanted beneath the coastline within the City's coastal zone jurisdiction, drawing from aquifer strata beneath the ocean.[14]  Accordingly, Cal-Am sought a coastal development permit from the City.  In March 2019, the City denied the request, finding that the project posed "a very serious danger of groundwater depletion."  Cal-Am appealed the decision to the California Coastal Commission.  That appeal remained unresolved throughout the trial court proceedings.  During the pendency of the present appeal, the Coastal Commission conditionally granted the permit and various parties, including MCWD, filed a petition for writ of mandate challenging that decision in the Monterey County Superior Court.[15]

---

[14] The Regional Desalination Project contemplated the installation of vertical intake wells on coastal dunes 800 feet inland.

[15] We grant the County and Cal-Am's request for judicial notice of the Coastal Commission's November 30, 2022 Notice of Decision.  We grant MCWD's request for judicial notice of the Coastal Commission's Final Adopted Findings following the de novo hearing.  We grant judicial notice of the petition for writ of mandate and complaint for declaratory and injunctive relief.

14

**G.**     *County Approval of Desalination Plant*

In September 2016, Cal-Am applied to the County for a permit to construct and operate the desalination plant and associated facilities in an unincorporated part of the county (the Permit).  In April 2019, the Monterey County Planning Commission approved the Permit.  MCWD and another entity separately appealed to the Board of Supervisors.

The Board of Supervisors held a public hearing on the appeals in July 2019.  In advance of the hearing, the City submitted a written comment arguing against approval and highlighting its own denial of Cal-Am's application for a coastal development permit.

Following the hearing, the Board of Supervisors denied both appeals and approved the Permit, subject to certain conditions.  In support of its decision, the board found, among other things, that the project was consistent with the County's general plan, no supplemental or subsequent EIR was necessary under CEQA, and the benefits of the project outweighed its unavoidable adverse environmental impacts (see § 21081; Guidelines, § 15093 [statement of overriding considerations]).[16]  The County rejected MCWD's contentions that new information required further environmental review of the Water Supply Project's impact on the Salinas Basin and the feasibility of further expansion of Pure Water Monterey as an alternative to the desalination plant as proposed. Anticipating the risk that construction of the desalination plant might be delayed or

---

[16] We grant the County and Cal-Am's unopposed requests for judicial notice of county-level documents offered as legislative history materials related to Monterey's general plan and the California Supreme Court's denial of the petitions for writ review of the CPUC decision certifying the final EIR and approving the Water Supply Project. (See Cal. Evid. Code, § 452, subs. (c)-(d) & (h).)  Aside from the requests expressly granted, we deny the parties' requests for judicial notice, which otherwise consist of California Coastal Commission and CPUC filings that post-date the County's decision and are irrelevant to the issues discussed here.  (See *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1135, fn. 1.)

15

interrupted for five years or more, or that "operation of the desalination plant [might] become permanently infeasible due to a lack of water supply source," the County imposed Condition 22, which in the event of such contingencies would require Cal-Am to seek approval from the County to either continue leaving the site idle or else restore, reuse or otherwise develop the site.

## II.    DISCUSSION

### A.    *CEQA*

MCWD contends that the County violated CEQA in determining both that further environmental review was unnecessary and that overriding benefits supported the project. We reject both contentions.

#### 1.    *The County's Findings*

The County found that no supplemental or subsequent EIR was needed to approve the Permit for the desalination plant because there were no "substantial changes to the project" or "the circumstances under which the project is undertaken" that involve "new significant environmental effects or a substantial increase in the severity of the previously identified effects" and "[n]o new information of substantial importance ha[d] been presented, which was not known and could not have been known with reasonable diligence at the time the previous EIR was certified as complete, that show[ed] . . . that 'the project will have one or more significant effects not discussed in the previous EIR;' that significant effects examined in the EIR 'will be substantially more severe than previously shown…'; that 'mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative'; or that 'mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative.' " While these findings are alternatively based in part

16

on the proposition that the County was not required to consider any environmental impacts that were not caused by the desalination plant itself,[17] the County nevertheless considered and rejected each of MCWD's arguments about new information or circumstances as to the project as a whole.

Further, the County found that "[t]he desalination plant would result in significant and unavoidable impacts that would not be mitigated to a less than significant level even with incorporation of mitigation measures" to "Traffic and Transportation" and "Air Quality." However, the County "determined that the benefits of the project outweigh its unavoidable adverse environmental effects so that the adverse environmental effects may be considered 'acceptable.' "

### 2.	*Standard of Review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426, fn. omitted (*Citizens for Responsible Growth*).)

"Compared with review for procedural error, 'we accord greater deference to the agency's substantive factual conclusions.' [Citation.] We apply 'the highly deferential substantial evidence standard of review in Public Resources Code section 21168.5' to

---

[17] The parties briefed their disagreement as to the scope of the environmental impacts Monterey was required to consider at some length. As explained below, we conclude that Monterey's alternate determination as to the scope of the environmental impacts is unnecessary because Monterey's assessment of the alleged new information and circumstances is supported by the record. Accordingly, we do not address Monterey's determination that it was required only to consider the environmental impacts of the desalination plant itself.

such determinations. [Citation.] 'The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision.' [Citation.] That deferential review standard flows from the fact that the agency has the discretion to resolve factual issues and to make policy decisions." (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 984-985 (*Native Plant*).)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case . . . is the same as the trial court's: the appellate court reviews the agency's action, not the trial court's decision." (*Citizens for Responsible Growth*, *supra*, 40 Cal.4th at p. 427; see also *Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.)

### 3. *Additional Environmental Review*

MCWD contends that the County was required to conduct additional environmental review, classified either as supplemental environmental review or subsequent environmental review, due to new issues or evidence that arose after CPUC finalized its EIR as the lead agency. MCWD points to five triggers: (1) The City's denial of permitting for the water intakes; (2) The County's adoption of Condition 22; (3) New information and regulatory actions regarding the groundwater gradient impacting the relevant aquifers; (4) New developments regarding Pure Water Monterey expansion; and (5) New information regarding the unused storage capacity of the aquifer system.[18] We conclude that the County adequately considered each of these alleged triggers.

---

[18] In passing, MCWD asserts that the Water Supply Project will destroy environmentally sensitive habitat areas. To that end, MCWD claims, without citation, that when the City denied Cal-Am permitting for the slant wells it was presented with relevant information that had not been submitted to the CPUC. But these assertions are not tethered to MCWD's arguments for supplemental environmental review of the proposed desalination plant.

### a. *Legal Principles*

"Once a project has been subject to environmental review and received approval, no further steps to comply with CEQA are required unless a further discretionary approval is necessary." (*Department of Water Resources Environmental Impact Cases* (2022) 79 Cal.App.5th 556, 575 (*Environmental Impact Cases*).) "If another discretionary approval is required, . . . the agency must determine whether further environmental review is required due to changes in the project, changes in circumstances, or new information." (*Id*. at p. 576.)

After an EIR has been prepared for a project, "no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:  (1) Substantial changes requiring major revisions in the EIR are (a) proposed in the project or (b) occur with respect to the circumstances under which the project is being undertaken; or (2) "New information,[19] which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (§ 21166; see also Guidelines, §§ 15162(a), (c), 15163(a).)  If any of these conditions is met, then a subsequent or supplemental EIR is required. (*Environmental Impact Cases*, *supra*, 79 Cal.App.5th at p. 576.)  We review for substantial evidence the County's determination that none of the circumstances under section 21166 exist.  (See *Save Livermore*, *supra*, 87 Cal.App.5th at p. 1133.)  " 'A party challenging an agency's decision under section 21166 has the burden to demonstrate that the agency's decision is not supported by

---

[19] "[N]ew information" must be of " 'substantial importance.' " (*Save Livermore Downtown v. City of Livermore* (2022) 87 Cal.App.5th 1116, 1133 (*Save Livermore*).) Examples include information showing that "the project would have significant effects not discussed in the EIR or [that] significant effects will be substantially more severe [than] shown in the previous EIR." (*Ibid*.)

substantial evidence and is therefore improper.' " (*Citizens' Committee to Complete the Refuge v. City of Newark* (2021) 74 Cal.App.5th 460, 470.)

### b. *Water Source*

At the time the County entered its discretionary approval, the City had denied permits for the slant wells and Cal-Am was seeking review by the California Coastal Commission. As such, MCWD contends that there had been "a substantial change with respect to the circumstances under which the desalination plant [was] being undertaken." MCWD asserts that, as a consequence of the City's denial, "Cal-Am had no water supply to desalinate" and "the desalination plant would need an entirely different water source." Thus, MCWD contends that the County needed to either prepare an EIR "analyzing . . . water sources and the potential environmental impacts those sources could cause" or "condition[] its approval on Cal-Am obtaining permits for the slant wells."

The City's denial of permitting, as a practical matter, changed neither the plan for the Water Supply Project nor the circumstances under which the project was being undertaken. Just as when the CPUC issued its approval, the slant wells continued to require approval by a responsible agency other than the County. The change represented by the City's denial of permitting was that Cal-Am, through its appeal, was now asking the California Coastal Commission to provide that which the City had denied. The final EIR recognized that the California Coastal Commission "retains jurisdiction over appeals" where the City "has jurisdiction through a Local Coastal Program." Because the Coastal Commission reviews local agency determinations under a de novo standard (see § 30621), neither the fact of the City's denial nor any factual findings the City made in reaching its decision materially altered the uncertainty as to whether the wells would ultimately be approved.

MCWD has not articulated any way in which the City's denial of permitting necessitates further environmental analysis because, when the County rendered its decision, it was premature to say that the desalination plant would need a different water

source. The City's denial of permitting did not constitute a substantial change in circumstances or new information of substantial importance because, in spite of the denial, Cal-Am continued to pursue approval of the same wells through the same means and subject to the same uncertainties contemplated by the final EIR.[20]

        **c.**     *Condition 22 and Construction of the Desalination Plant without all Project Approvals*

Under Condition 22: "Should operation of the desalination plant become permanently infeasible due to a lack of water supply source, or should plant construction cease for a period of at least five consecutive years ('Idle Period') due to any factors beyond or within the applicant or owner's control (excluding a delay or lapse in construction related to pending administrative proceedings or litigation relating to or affecting the Monterey Peninsula Water Supply Project), the applicant or owner shall apply to the County to (1) extend the Idle Period; (2) obtain a new Use Permit that would allow adaptive re-use of the site; (3) implement a site restoration plan to return the site to as close to its predevelopment state as is feasible; and/or (4) implement a feasible alternative for site use and/or restoration." MCWD contends that Condition 22 requires future action—removing "the option of doing nothing"—such that the County was required to study the environmental impacts of Condition 22, if triggered, before approving the desalination plant subject to the condition's terms.

We reject the starting premise of MCWD's argument—Condition 22 does not compel future development or preclude Cal-Am from doing nothing with the site should

---

[20] MCWD's suggestion that Monterey should have issued a permit that was conditioned on securing a water supply is not tethered to the present discussion. We are not assessing whether it was a good idea to clear the way for construction of a desalination plant, with the significant adverse environmental impacts construction would unavoidably entail, without confirmation that the permitting for other necessary components of the project would be obtained. We are assessing whether changed circumstances or new information required further environmental review.

21

the Water Supply Project stall or fail. Instead, if triggered, it provides a mechanism by which the County is empowered to compel further action, including restoration of the site to status quo ante, or to permit the site to remain idle for some further period. Considering the plain terms of Condition 22, we further reject MCWD's contention that *Laurel Heights Improvement Assn. v. Regents of the University of California* (1988) 47 Cal.3d 376, 396 (*Laurel Heights*) requires further environmental review.

"[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be considered in a subsequent EIR before the future action can be approved under CEQA." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) In *Laurel Heights*, the EIR "defined the project as 'mov[ing] the School of Pharmacy basic science research units from the UCSF Parnassus campus to Laurel Heights.' " (*Id.* at p. 393.) But, at the time, only 100,000 square feet of the 354,000-square-foot building was available to UCSF, and the EIR did "not discuss the additional environmental effects, if any, that will result from UCSF's use of the remaining 254,000 square feet when it becomes available." (*Ibid.*) UCSF "admitted that they intended to use the entire facility" and there was "telling evidence that the University, by the time it prepared the EIR, had either made decisions or formulated reasonably definite proposals as to future uses of the building. At a minimum, it is clear that the future expansion and the general types of future activity at the facility are reasonably foreseeable." (*Id.* at p. 397; see also *id.* at p. 398 ["there is credible and substantial evidence that UCSF's plans are reasonably foreseeable"].) In that context, "the EIR was inadequate because it fail[ed] to discuss the anticipated future uses of the Laurel Heights facility and the environmental effects of those uses." (*Id.* at

22

p. 399.)  UCSF was required to "provide sufficient meaningful information regarding the types of activity and environmental effects that are reasonably foreseeable when the remainder of the Laurel Heights facility is used by UCSF."  (*Ibid*.; see also *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 121-122, 134 ["City of West Hollywood's conditional agreement to sell land for private development, coupled with financial support, public statements, and other actions by its officials committing the city to the development, was, for CEQA purposes, an approval of the project that was required . . . to have been preceded by preparation of an EIR"]; *Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214, 1231 [road realignment and construction of home improvement center were a single project because opening the home improvement center was conditioned on completion of the road realignment].)

Here, in contrast, the project proponents intend for the Water Supply Project to be completed, such that Condition 22 is never triggered.  Unlike MCWD's authority, this is not a case where the project proponent intends to pursue a larger project—that is, a project that requires Condition 22 to be completed—but failed to analyze the environmental impacts of that piece of the project.

The California Supreme Court declined to extend *Laurel Heights* "to situations where project opponents claim, not that the proposed project will lead to additional development, but that the proposed project cannot be carried out as approved and will require additional work that may or will have a significant environmental effect.  The latter situation, unlike the former, presents little risk of either bureaucratic and financial impediments to proper environmental review or piecemeal review of a project with the potential for significant cumulative effects. . . . [I]f a proposed project cannot be built as approved, then the project's proponents will have to seek approval of any additional activities and, at that time, will have to address the potential environmental effects of those additional activities." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60

23

Cal.4th 1086, 1120 (*Berkeley Hillside*).) As a practical matter, Condition 22 is nothing more than an acknowledgment that additional work may be required if the project cannot be carried out as planned. Thus, *Berkeley Hillside* applies here, foreclosing MCWD's argument. (See *id*. at pp. 1119-1120 ["finding of environmental impacts must be based on the proposed project as actually approved and may not be based on unapproved activities that opponents assert will be necessary because the project, as approved, cannot be built"].)

Even if the two-step inquiry set forth in *Laurel Heights* were to apply here, the second step is not satisfied. As to the first step, the County's adoption of Condition 22 shows that the triggering event was reasonably foreseeable. But even if triggered, the condition does not call for "action [that] will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 396.) While guessing at what may happen if Condition 22 is triggered is inherently speculative, the County may just as likely choose to keep the plant idle in the hope that a water supply will one day be secured.[21]

### d. *Groundwater Gradient*

In connection with the County's consideration of the Permit, MCWD pointed to three developments that, it contended, required further environmental analysis: (1) fall 2018 data from Cal-Am monitoring wells discussed in new Hopkins and EKI memos showed seaward gradients within the Dune Sand Aquifer, such that, at least under "normal and wet rainfall conditions," the intake wells' capture zone would include more fresh water than anticipated; (2) the adoption of a Groundwater Sustainability Plan for the

---

[21] The final EIR reflects that several alternative water sources were considered and rejected. It is by no means a foregone conclusion, as MCWD would have it, that because Condition 22 is triggered Cal-Am will have to repurpose the desalination plant or tear it down. Even if the proposed water intake system meets insuperable legal obstacles, the record suggests that Cal-Am may be able to pursue alternatives while the desalination plant remains idle.

Salinas Basin pursuant to the Sustainable Groundwater Management Act (Water Code, § 10720 et seq.) indicated that the gradient within the Salinas Basin would shift seaward during the useful life of the Water Supply Project; and (3) the AEM study discounted by the CPUC should either have been given more weight or be reconsidered in conjunction with the new information.

HWG submitted a response memo to the County that addressed hydraulic gradients, the Salinas Basin Groundwater Sustainability Plan, and the AEM study results. As to the hydraulic gradients, HWG opined that the recent localized gradient reversal was the anomalous result of an abnormally wet rainfall year, which did not modify the long-term trend of seawater intrusion in the aquifers from a prevailing landward gradient. Regardless, HWG stated that the Water Supply Project would improve groundwater quality relative to historical trends by capturing ocean water, even if there was a seaward gradient.

The County found, among other things, that (1) "[t]he new [monitoring well data made available after the CPUC's decision] . . . that [MCWD] cites is . . . not significantly different from monitoring data available prior to the CPUC decision and [does] not constitute new information requiring supplemental environmental review"; (2) the steps taken to implement the Sustainable Groundwater Management Act were "not new information that trigger[] supplemental environmental review"; and (3) the new information regarding the AEM study was "not new information requiring supplemental environmental review."

On appeal, MCWD maintains that between the time CPUC finalized the EIR and the County entered its discretionary approval, new information "establish[ed] a reversal of the groundwater gradient" such that "the MPWSP will capture more freshwater than previously assumed"—i.e., that it will have new or substantially more significant environmental effects. Specifically, MCWD challenges the County's findings that: (1) the new Cal-Am monitoring well data made available after the CPUC's September

25

2018 decision did not significantly differ from data the CPUC had considered; (2) the steps taken to implement the Sustainable Groundwater Management Act were not new information that triggered supplemental environmental review; and (3) the responses to the critique of the AEM study were not new information requiring supplemental environmental review.

Our deferential review, however, turns not on the existence of substantial evidence in support of MCWD's concerns but on the existence of substantial evidence in support of the County's findings. Accordingly, we uphold the County's determination that it was not required to conduct further environmental review based on the new information regarding the groundwater gradient identified by MCWD. (See *Save Livermore*, *supra*, 87 Cal.App.5th at p. 1133.)

First, the County's determination that the fall 2018 monitoring data is not new information that required further environmental review is supported by the record. In general terms, monitoring data reflected that in the earlier portion of the 2015-2018 monitoring period, at the end of a drought, certain groundwater gradients near the proposed intake wells were landward, but in the latter portion, after a wet year, those gradients were seaward.[22] Some consultants opined that the reversal called for further study, but another consultant—HWG—reached the opposite conclusion. HWG's opinion was based on long-term trends of below-average precipitation, increasing seawater intrusion—and the ocean's anticipated role as a recharge boundary for the capture zone. The County credited HWG. MCWD asserts that HWG's opinion is not "substantial evidence" because it "is contradicted." But in reviewing the County's findings for substantial evidence, we do not reweigh the evidence or substitute our own judgment for

---

[22] The County was entitled to treat the 2018 data as less than revelatory. In arguing that the 2018 data was significant new information, Hopkins acknowledged it confirmed a trend that had begun in 2017 but treated that confirmation as noncumulative.

26

the agency's in its resolution of evidentiary conflicts.[23] (See *Native Plant*, *supra*, 177 Cal.App.4th at pp. 984-985; *Laurel Heights Improvement Assn. v. Regents of the University of California* (1993) 6 Cal.4th 1112, 1136, fn. 23.)  While there was plainly a dispute between consultants in this case, we are unable to identify any reason to deem HWG's opinion inadequate as a matter of law.  Accordingly, we conclude that substantial evidence supported the County's determination that the new monitoring well data and related opinions did not constitute the sort of new information of substantial importance that would necessitate further environmental review.

Second, the regulatory developments pursuant to the Sustainable Groundwater Management Act likewise do not constitute new information requiring further environmental review.

Enacted in 2014, the Sustainable Groundwater Management Act requires groundwater sustainability plans to include "[m]easurable objectives . . . to achieve the sustainability goal in the basin within 20 years of the implementation of the plan[,]" although up to 10 years of extensions may be available.  (Water Code, § 10727.2, subd. (b).)  MCWD argues that because groundwater sustainability plans for various relevant subbasins were due in January 2020 or January 2022, sustainability in all subbasins will need to be achieved by 2042.

As of July 2019, EKI stated that it remained "unclear which projects will be implemented or if other alternative projects may be needed," but it was "clear" that "the

---

[23] For example, MCWD points to rainfall data in an EKI report as evidence that HWG's opinion was unsupported, urging us to conclude that the groundwater gradient is seaward in " 'normal' " rainfall conditions.  To the extent that MCWD is asking us to reweigh the evidence and substitute our judgment for that of the County, we reiterate the limits of our deferential review for substantial evidence.  The County could legitimately infer from EKI's 36 years of annual precipitation data that, on balance, "normal" rainfall conditions would not result in an enduring seaward gradient and that the years preceding the observed reversal in gradient were above average to a degree difficult to characterize as "normal" rainfall.

27

groundwater system must achieve equilibrium" and "landward gradients must be reversed" to achieve "sustainable management criteria" outlined in a chapter of a draft groundwater sustainability plan for the Salinas Valley Groundwater Basin released after the CPUC rendered its decision. At that time, approximately eight basin-wide projects and five alternative projects had "been prioritized and [we]re being further evaluated." EKI opined that groundwater equilibrium and landward gradients were "totally inconsistent with groundwater conditions evaluated" in the final EIR, "which assume[d] that landward gradients will persist into the future." The assumption implicit in EKI's opinion, however, is that a groundwater sustainability plan, once adopted, will sufficiently reverse the landward gradient that the volume of fresh water will force the seawater intrusion front to retreat beyond the capture zone of the intake wells. MCWD has not established that the County was compelled to accept the validity of this assumption on this record.

The new information revealed by the interim steps toward a groundwater sustainability plan is limited. The CPUC was well aware that the Sustainable Groundwater Management Act would require action to prevent seawater intrusion and protect groundwater levels when it certified the final EIR and approved the project. But, in responding to the contention that the Sustainable Groundwater Management Act indicated that future groundwater projects could flatten or reverse the inland groundwater gradient, the CPUC found that it "would realistically require decades of groundwater management to flatten or reverse the inland groundwater gradient, much less reverse it, and expectations that groundwater projects would be successful in affecting the inland gradient within the life of the MPWSP would be overly optimistic. There are no reasonably foreseeable cumulative projects proposed to reduce or reverse the current landward gradients in the Dune Sands and 180-Foot aquifers at this time, and while projects under the [Sustainable Groundwater Management Act] may improve the sustainability of the [Salinas Basin] . . . such actions or projects are too speculative to

assume and opine about in the EIR/EIS." MCWD has not identified any concrete new developments that occurred between the CPUC's analysis and the County's action—MCWD points only to its consultant's interpretation of the circulation of draft chapters of the groundwater sustainability plan.[24]

We recognize that the CPUC acknowledged a "long-term" possibility that, were the gradient to be reversed, "the source of the water drawn from the extraction well system would need to be revisited." But the CPUC was clear that such an outcome was "total speculation," even taking the Sustainable Groundwater Management Act into account. We are not persuaded that draft language and the ongoing evaluation of proposed projects—precursors to the future adoption of a groundwater sustainability plan and project plans—constitute the sort of new information that would require further environmental review.

Regardless, the County was entitled to rely upon HWG's reaffirmation that even in hypothetical seaward gradient conditions "the vast majority of intake water [will] still come[] from the ocean" and "will follow a direct path from the sea bed to the intake well screens." HWG opined that the "minor contribution [of groundwater] from inland flow paths" would be "a net benefit to the basin by pulling the sea water intrusion front closer to the ocean."

Third, MCWD concedes that the AEM study "had previously been submitted to the CPUC." While MCWD makes it clear that it disagrees with the CPUC's analysis of the AEM study, MCWD's contention seems to be that the County was required to conduct its own evaluation of the AEM study because there were new groundwater data

---

[24] MCWD asserts that the CPUC was wrong that the gradients could not foreseeably be flattened or reversed because data has shown a reversal. But we understand the CPUC to be referring to long-term trends. The consultants on both sides attributed the observed reversal to recent rainfall patterns. As explained above, there was substantial evidence in the record for the County to conclude that the trend was landward.

supporting AEM's prior conclusions and new letters by proponents of the study defending its methodology. MCWD, however, does not establish that the data or letters were new, noncumulative, or of substantial importance, relative to the information previously considered by the CPUC.

As to the groundwater data, MCWD, relying on an EKI memo, argues that new monitoring data from Fort Ord confirmed the results of the AEM study. But, responding to the EKI memo, HWG opined that the Ford Ord data was not new because data had been collected from the same well for many years and was immaterial because Fort Ord is far removed from the Water Supply Project area. Accordingly, even if the confirmatory data were technically new, we are satisfied that the new data was not new information of substantial importance, where comparable data were available when the CPUC certified the EIR. (See § 21166; *Save Livermore*, *supra*, 87 Cal.App.5th at p. 1133.)

As to the further discussion of the AEM study, MCWD does not explain why any of the information "was not known and could not have been known" when the CPUC certified the EIR. (§ 21166, subd. (c).) Instead, MCWD suggests that it could have more persuasively defended the study and its significance, had Knight been given an opportunity to testify before the CPUC. But this supports the inference that the information was available prior to certification, and hence is not new.[25]

---

[25] MCWD relies on the AEM study to bolster its arguments about the significance of other new information about the groundwater gradient. Given the deferential character of our review, the existence in the record of substantial evidence to support the County's determination makes it unnecessary to address the particulars of these arguments. Different consultants reached divergent opinions as to the significance of the AEM study, and MCWD has not established that the AEM study precluded HWG from forming the opinions that supplied substantial evidence for the County's decision or that the County abused its discretion in relying on HWG's opinions.

### e.     *Pure Water Monterey Expansion*

MCWD contends that new information regarding Cal-Am's user demand and progress with respect to Pure Water Monterey expansion precluded the County from dismissing this expansion as an infeasible alternative, whether standing alone or in conjunction with a down-sized desalination plant.  But as we explain below:  (1) it was appropriate for the County to rely on the CPUC's demand assessment; and (2) the County did not violate CEQA in its assessment of Pure Water Monterey expansion as a potential alternative, including in its determination that expansion was not a legally feasible alternative at the time it rendered its decision.

### i.     *Demand Assessment*

MCWD has not identified changed circumstances or new information that required Cal-Am's future demand to be reevaluated.  Accordingly, it was appropriate for the County to rely on the CPUC's demand assessment in the final EIR and in its approval of the project as a lead agency.

In the final EIR, the CPUC projected the demand to be satisfied by the Water Supply Project at 14,275 afy.  This figure included 12,270 afy for existing annual system demand, 325 afy for Pebble Beach entitlements, 1,180 afy for the development of legal lots of record, and 500 afy for economic recovery to the hospitality industry from the 2008 recession.  Of the 500 afy tied to economic recovery to the hospitality industry, 250 afy was associated with new demand spurred by the availability of water generated by the Water Supply Project and 250 afy was associated with an increase in demand for existing uses.  However, the CPUC noted that the 250 afy associated with increase in demand for existing hospitality uses may be overstated, as some measure of economic recovery had already occurred and commercial water use had been made more efficient by permanent conservation measures.  The 1,180 afy for development of legal lots of record was also contingent on new supplies being generated by the Water Supply Project.

31

Thus, 1,430 afy of the 1,680 afy estimated increase in demand was contingent on the generation of an increased water supply that would flow from the Water Supply Project.

The responses to the final EIR included a variety of estimates of future demand, ranging from Coalition of Peninsula Businesses' 15,000 afy recommended estimate to MCWD's low-end estimate of 9,675 afy—with Cal-Am's estimate falling at 14,355 afy. In approving the Water Supply Project, the CPUC adopted an estimate of 14,000 afy—355 afy lower than Cal-Am's final estimate, which was "reasonable" in the CPUC's view.

MCWD argues that the County needed to revisit the CPUC's conclusion regarding demand because "Cal-Am's . . . demand figures generated after the CPUC certified the EIR showed that demand within Cal-Am's service area remained flat and had not increased as a result of the recovered economy as the EIR previously assumed."

At the outset, MCWD does not point to Cal-Am's actual demand figures in the record, but instead points to its own assertions in the record about Cal-Am's demand figures and to oral comments made by Public Water Now and the Monterey Peninsula Water Management District before the County.

Even assuming Cal-Am's actual demand remained flat during the unspecified time period for which new data may be available, we are unable to conclude such data would require reconsideration of the CPUC demand estimate. The marginal increase in demand projected from economic recovery alone—independent of the Water Supply Project—accounted for only 250 afy—less than 2 percent—of a 14,275 afy estimate in the final EIR. The CPUC did not take Cal-Am's estimate as "perfect," merely "reasonable," and the CPUC accordingly estimated future demand at 14,000 afy. The fact that the relatively small projected increase in demand had not materialized in what appears to be a relatively limited time period is not the sort of new information of substantial importance that requires the question of Cal-Am's future system demand to be reopened. (See generally *Save Livermore*, *supra*, 87 Cal.App.5th at p. 1133.)

### ii.     *The County's Feasibility Determination*

The progress toward Pure Water Monterey expansion that occurred between the CPUC's evaluation and the County's discretionary permitting decision as a responsible agency did not preclude the County's determination that the projected expansion continued to fall short of a feasible alternative to the desalination project.

" 'The lead agency is responsible for selecting a range of potential alternatives for examination and must publicly disclose its reasoning for selecting those alternatives.' (Guidelines, § 15126.6, subd. (a).)' " (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 741 (*Tiburon*).)  " 'Like mitigation measures, potentially feasible alternatives "are suggestions which may or may not be adopted by the decisionmakers." ' " (*Native Plant*, *supra*, 177 Cal.App.4th at p. 999.)  "A 'feasible' alternative is one that could accomplish 'most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects.' (Guidelines, § 15126.6, subd. (a).)" (*Tiburon*, *supra*, 78 Cal.App.5th at p. 741.)  To be "[f]easible," the alternative must be "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." (Guidelines, § 15364; see also *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 566 (*Goleta Valley*).)

Although a responsible agency " 'relies on the lead agency's environmental document[,] . . . [t]he responsible agency must . . . issue its own findings regarding the feasibility of . . . project alternatives that can substantially lessen or avoid significant environmental effects.' " (*Riverwatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1201 (*Riverwatch*).)  " '[B]efore reaching a decision on the project, the decision-making body of the responsible agency must consider the environmental effects of the project as shown in the EIR . . . and feasible . . . alternatives within the agency's powers.  [Citation.]  If the responsible agency finds that any alternatives . . . within its powers are feasible and would substantially lessen or avoid a significant effect

33

of the project, the responsible agency may not approve the project as proposed, but must adopt the feasible . . . alternatives.' " (*Id*. at p. 1202; see also Guidelines, § 15096, subd. (g)(2).)

In March 2019, after the CPUC approved the Water Supply Project pursuant to its analysis of the information then available about Pure Water Monterey expansion, Monterey One Water's General Manager asked the board of Monterey One Water to authorize $1 million to "continue and substantially complete the environmental and permitting work" for expansion. The stated reason for this was to ensure that Pure Water Monterey expansion could meet the December 31, 2021 cease and desist order deadline. If expansion was abandoned, Monterey One Water's contribution would be reimbursed by Monterey Peninsula Water. The board approved the expenditure, and in April 2019, Monterey One Water "st[ood] ready to provide a viable water supply" by undertaking the necessary work to move the project forward.

As of July 2019, when the County made its decision, Monterey One Water's General Manager anticipated that the draft supplemental EIR for Pure Water Monterey expansion would be published October 2019 with a final EIR targeted for February 2020. Representatives for both Monterey One Water and Monterey Peninsula Water described Pure Water Monterey expansion as a backup to the Water Supply Project.

In its permitting proceedings, the County separately considered both expansion of Pure Water Monterey (from 5 mgd to 7.6 mgd) and a further reduction in the desalination plant's size as project alternatives. As to the Pure Water Monterey expansion, the County found that the alternative was not "legally feasible at this time" because Monterey One Water had not yet approved the expansion, the results of ongoing evaluation and supplemental environmental review related to project expansion were unknown, and the project would require permits from agencies other than the County. Moreover, the

34

County expressed concern[26] as to whether there would be reliable source water to support expansion and, even assuming reliable source water, indicated that the expansion's projected output may not be at the scale needed to meet demand. As to the size of the plant, the County found that the 3,500 afy water expected from the 5-mgd Pure Water Monterey plant already under construction, 6.4 mgd of desalination capacity was necessary to meet projected demand. But, having determined that further expansion of Pure Water Monterey was infeasible, the County did not consider whether such expansion could warrant a smaller desalination plant.

Fundamentally, the County was presented with a request to build a 6.4-mgd desalination plant, the size of which could be reduced in increments of 1.6 mgd. Expansion of Pure Water Monterey—if completed with its resulting increase in supply made available to Cal-Am—would not generate enough new water to obviate the need for another water source: the anticipated increase in supply from expansion was in the range of 2 mgd to 2.6 mgd. Given the estimated demand, which we have concluded the County did not need to reassess, the County's determination that expansion of Pure Water Monterey could not meet the basic project objectives was supported by substantial evidence. (See *Tiburon*, *supra*, 78 Cal.App.5th at p. 741 [defining feasible alternative].)

To the extent the County did not discuss the potential for downsizing the 6.4-mgd desalination plant in conjunction with the expansion of Pure Water Monterey, its rejection of this possibility must rest on the County's determination that the Pure Water Monterey expansion was not a legally feasible alternative because it was in its nascent

---

[26] The County referred to concerns raised by Cal-Am and the Monterey County Water Resources Agency, an agency created by the Monterey County Water Resources Agency Act in 1990 and charged with preventing the waste or diminution of water supply in its territory by, among other things, controlling groundwater extractions and prohibiting groundwater exportation from the Salinas River Groundwater Basin.

stages and in the jurisdiction of other agencies. For the reasons that follow, we conclude that the County did not violate CEQA in reaching that determination.

It is appropriate for both lead agencies and, as relevant here, responsible agencies to consider the limits of their power in assessing whether alternatives are feasible. (See *Goleta Valley*, *supra*, 52 Cal.3d at p. 575, fn. 7; *Riverwatch*, *supra*, 170 Cal.App.4th at pp. 1201-1202; Guidelines, § 15096, subd. (g)(2).) Here, the record before the County reflected that Pure Water Monterey expansion had been proposed as a short-term backup plan should the Water Supply Project be temporarily delayed, but environmental review and design to expand Pure Water Monterey for this purpose was ongoing; Monterey One Water had not yet decided whether to approve the project, and, aside from funding necessary to proceed with environmental review and design, funding and permitting would still need to be secured. These reasons adequately support the County's discretionary determination that expansion of Pure Water Monterey was not at the time a feasible alternative to the desalination plant at the proposed capacity of 6.4 mgd.[27] Accordingly, we conclude that the County did not abuse its discretion under CEQA in determining that a future expansion of Pure Water Monterey did not make downsizing the desalination plant a feasible project alternative.

We further reject MCWD's contention that the County was at a minimum required to expand upon the CPUC EIR due to new information pertaining to expansion of Pure Water Monterey.

---

[27] The cases on which MCWD relies are unhelpful. (See *Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 715-716 [public agency did not abuse its discretion in determining that legally prohibited action was legally infeasible]; *Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230, 237-241 [reversing on de novo review the county's determination that agricultural conservation easements were legally infeasible mitigation for loss of prime farmland, given the county's erroneous legal conclusion that offsite conservation could not mitigate project-site impacts].)

36

When the CPUC rejected Pure Water Monterey expansion as a feasible alternative to the Water Supply Project, the components of the expansion had been identified and preliminary design work had already begun. Much remained, however, including design, environmental review, and permitting.

The new information available to the County consisted of further preparatory steps in Monterey One Water's exploration of Pure Water Monterey expansion. The April 2019 authorization of funding for environmental work and further design analysis was, as Monterey One Water's General Manager explained to its board of directors in the March 2019 report, "to have a ready-to-go alternative in place if the desalination facility is stalled," as "[t]he potential expansion of [Pure Water Monterey] is the only backup water supply to the Cal[-]Am desalination plant that could meet the Cease and Desist Order . . . deadline of December 31, 2021." In an April 2019 letter explaining the significance of its authorization to the CPUC, Monterey One Water explained that it authorized the expenditure to head off criticism that there was " 'insufficient information' " supporting expansion of Pure Water Monterey by taking "another concrete step towards gaining necessary certainty" and positioning "PWM expansion, if it becomes necessary, to complete bid documents within another six months and to construct within a year." In the letter, Monterey One Water acknowledged that expansion could "be deemed unnecessary or infeasible," but explained that "the expenditure of these funds will enable PWM expansion 'to be ready to go in the event the desalination plant becomes stalled' such that the future 'go/no go' decision would involve completion of design, permitting, amendment of the WPA, and construction.' " In July 2019, when the County rendered its decision, the environmental review process remained incomplete. Thus, when the County acted, expansion of Pure Water Monterey had been presented as a potential alternative (as to which planning and review were incomplete) in the event of delay or abandonment of the desalination project as a whole, with no commitment to act if the desalination plant were approved even at reduced size.

37

The County was thus presented with substantially the same universe of operative facts as was the CPUC.[28]  Although the notice of preparation signaling commencement of environmental review mitigated some of the issues flagged by the CPUC, it remained the case that Monterey One Water had not approved expansion.  Moreover, with environmental review of expansion incomplete, there was no evidence that expansion combined with a smaller desalination plant would reduce significant environmental effects of the Water Supply Project.[29]  The circumstances under which the project was being undertaken had not "substantial[ly] change[d]" so as to require "major revisions in the [EIR]."  (See § 21166.)

### f.  *Storage*

MCWD further argues the December 2018 Seaside Groundwater Basin Management Action Plan (Seaside Basin Management Plan) constitutes new information,

---

[28] For the first time at oral argument and without citing authority, MCWD suggested that the County did not adequately consider expansion of Pure Water Monterey, when the implementation of that expansion had become "reasonably foreseeable" due to the developments that occurred after the CPUC acted.  (See generally *Citizens for Responsible Growth*, *supra*, 40 Cal.4th at p. 434 [EIR did not need to establish a likely water source but was required to discuss the impacts of all reasonably foreseeable alternative sources of water for the project].)  MCWD may by its reference to reasonable foreseeability intend to suggest that the expansion would increase the baseline water supply in the region such that the demand assessments underpinning the sizing of the desalination plant needed to be revisited.  This would mark a departure from MCWD's previous contentions, all of which related to the feasibility of Pure Water Monterey as a project alternative rather than an independent project that would impact baseline demand requirements.  In any event, the record reflected that Pure Water Monterey expansion was still being considered as an alternative rather than an independent project.  MCWD has not shown that the circumstances under which the project was being undertaken had substantially changed in regard to Pure Water Monterey expansion's positioning as a project alternative.

[29] Pursuant to the final EIR, as followed by Monterey, the significant and unavoidable impacts that would not be mitigated to a less than significant level were limited to construction-related impacts on traffic, transportation, and air quality.

38

in that it "revealed that the [Seaside] Basin has lost 43,500 acre-feet of groundwater storage over the last 30 years" of overdraft, providing "significant opportunities for storage and banking of groundwater . . . which could provide an alternative water supply that was not considered in" the CPUC's EIR.  MCWD posits that "Cal-Am could meet its water supply needs without desalination through the [Pure Water Monterey] Expansion in conjunction with banking excess supply" in the basin.

MCWD's argument presumes excess supply from a future expansion of Pure Water Monterey.  But as we have concluded, the County was entitled to discount the prospective expansion as both speculative and inadequate to meet, let alone exceed, annual demand.  Accepting the proposition that the quantification of available storage capacity may technically be novel, the fact of excess capacity is not:  the existence of storage capacity from decades of overdraft merely confirms the historical inadequacy of existing supply; it adds nothing to the County's evaluation of the desalination plant as a new source of potable water.

### 4.    *Statement of Overriding Considerations*

"Before approving a project with significant unavoidable environmental impacts, a public entity must make an express written determination that the project's benefits outweigh any potential environmental harm." (*Native Plant*, *supra*, 177 Cal.App.4th at p. 983; see also *City of Marina v. Board of Trustees of the California State University* (2006) 39 Cal.4th 341, 350; *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 524-525.)  This "statement of overriding considerations" " 'is intended to demonstrate the balance struck by the body weighing the "benefits of the proposed project against its unavoidable environmental risks." ' " (*Native Plant*, *supra*, 177 Cal.App.4th at p. 983.) It " 'focuses on the larger, more general reasons for approving the project.' " (*Ibid.*)

In its statement of overriding considerations, the County identified six benefits of the "proposed project."  Five of these were water-related:  (1) Cal-Am would cease its illegal diversions from the Carmel River and meet its obligations under existing cease

39

and desist orders; (2) Cal-Am would not need to extract water from the Seaside Basin to meet demand; (3) The long-term water supply, reliability, and infrastructure in the Monterey Peninsula would improve; (4) Reduced pumping from the Carmel River would benefit habitat, wildlife, and marine species; and, (5) pursuant to its Salinas Basin return water obligation, Cal-Am would make water available to other water suppliers,[30] such as Castroville Community Services District, that rely on the Salinas Basin. The sixth was not: "The project will provide local and regional economic benefits to the Monterey Peninsula area. Construction will boost temporary new local employment opportunities[ and cause] increased spending on construction materials, equipment, and services."

Particularly in light of the City's denial of permitting to drill the slant wells, MCWD contends that the County could not rely on any benefits that depended on access to source water in its statement of overriding considerations. Moreover, MCWD contends that the County was required, but failed, to acknowledge that any water-related benefits may never materialize because Cal-Am may never secure source water for the desalination plant.

As we explain below, the County was permitted to consider water-related benefits anticipated from completion of the multijurisdictional Water Supply Project as approved by the CPUC as lead agency.[31] Even assuming that the County violated CEQA by failing

---

[30] As described in the final EIR, pursuant to a settlement, Cal-Am will fulfill its return water obligation by making return water available to water suppliers rather than by injecting it into the Salinas Basin. Castroville Community Services District, which provides municipal and domestic water service to the Town of Castroville, would be first in line to receive return water. The Castroville Seawater Intrusion Project would receive any remaining return water.

[31] To the extent the County and Cal-Am assert the sufficiency of the construction-related benefits, standing alone, the County made no express finding that the construction related benefits were themselves sufficient to outweigh the environmental impact of the project, unlike the cases on which it and Cal-Am rely. (See *Habitat & Watershed*

to acknowledge the ongoing regulatory processes concerning source water or explain its reasons for granting the Permit before a water source had been secured, any such error was not prejudicial.

### a. *Legal Principles*

"While 'CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits . . . of a proposed project against its unavoidable environmental risks when determining whether to approve the project,' 'the adverse environmental effects may be considered "acceptable," ' '[i]f the specific economic, legal, social, technological, or other benefits . . . of a propos[ed] project outweigh the unavoidable adverse environmental effects . . . .' " (*Cedar Fair, L.P. v. City of Santa Clara* (2011) 194 Cal.App.4th 1150, 1174.) Unlike mitigation and feasibility findings, which focus on specific proposed measures, overriding considerations " 'are "larger, more general reasons for approving the project" ' " and "are intended to show the 'balance' the agency struck in weighing 'the "benefits of a proposed project against its unavoidable environmental risks." ' " (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 356-357 (*Cherry Valley*).)

"The override decision 'lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned. [Citation.] Override findings are sufficient if they 'demonstrate the balance struck' by an agency in 'weighing the benefits of the proposed project against its unavoidable adverse impacts.' [Citation.] Additionally, 'a statement of overriding considerations must be supported by substantial evidence contained in "the final EIR and/or other information in the record." ' " (*Native Plant*, *supra*, 177 Cal.App.4th at p. 983.)

---

*Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1308; *The Flanders Foundation v. City of Carmel-by-the-Sea* (2012) 202 Cal.App.4th 603, 624-625.)

### b. *Mootness*

The County and Cal-Am contend that the Coastal Commission's approval of the slant wells moots MCWD's claims regarding the statement of overriding consideration, such that we should reverse the portions of the trial court's judgment granting MCWD's petition without analyzing MCWD's substantive claims. The conditional nature of the Coastal Commission's approval, which the County and Cal-Am do not address in their supplemental briefing, suggests otherwise.

The trial court accepted MCWD's fundamental contention that the County could not in its statement of overriding considerations rely on water-related benefits because the attainment of those benefits was speculative. The trial court's finding was based on the fact of the City's denial of permitting, together with the potential that Cal-Am would be unable to secure a permit and, ultimately, source water by appealing the City's denial to the Coastal Commission. In MCWD's view, Cal-Am's ability to secure source water remains speculative even after the Coastal Commission's conditional approval of permitting.[32]

Thus, the parties' fundamental legal dispute persists—whether the County's statement of overriding considerations may rely on the water-related benefits of a desalination plant where it is uncertain that the plant's proposed water source will be permitted, at least where the statement of overriding considerations does not acknowledge the ongoing uncertainty. We cannot answer the question posed by the mootness challenge—that is, whether the County may rely on a statement of overriding considerations that depends on water-related benefits after the Coastal Commission

---

[32] The trial court's written decision suggests that it would have viewed the issue differently if it had been called upon to evaluate the case "if Cal-Am succeeded in its appeal to the Coastal Commission" such that the denial of slant well permits was "overturned" and Cal-Am "would ultimately secure the water source analyzed by the EIR." We will not speculate as to the significance the trial court would have ascribed to the Coastal Commission's conditional approval.

42

conditionally approved permitting for the water intakes—without resolving the substantive issues raised by the appeal.

### c. *Water-Related Benefits*

The parties dispute whether the County was permitted to consider water-related benefits in deciding whether the benefits of the project outweighed its environmental impact.  MCWD contends that because the City had denied permitting for the slant wells, the County was limited to considering the benefits of the project without a water source.  We disagree with MCWD's interpretation of the statute.

CEQA provides that "no public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more significant effects on the environment that would occur if the project is approved or carried out unless," as relevant here, "[w]ith respect to significant effects" as to which "mitigation measures or alternatives" are "infeasible," "the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."  (§ 21081; see also Guidelines, §§ 15043, 15093, 15096(h).)  " '[P]roject' " is a defined term, meaning "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:  [¶] (a) An activity directly undertaken by any public agency.  [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."  (§ 21065; see also Guidelines, §§ 15002(d), 15378.)

As a matter of statutory interpretation, the question posed here is whether the term "project," as used in subdivision (b) of section 21081 in relation to the benefits to be considered, is properly interpreted to apply to the entire "project for which an

43

environmental impact report has been certified" or only the narrower component within the jurisdiction of one of many responsible agencies. (See § 21081.) In that vein, we observe that the Guidelines use a different definition of " '[p]roject' " to expressly refer to "the whole of an action"—"the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies"—not "each separate government approval." (Guidelines, § 15378(a), (c).)

We read "project" as used in section 21081 in the same sense that it is defined in the Guidelines. That is, the benefits that a public agency may consider in deciding whether to approve a part of a larger project as a responsible agency include the benefits of the project as a whole. In so doing, we reject the contention that a responsible agency can only consider the benefits inuring to it from its portion of the project, assuming the balance of the project is not completed. There is nothing in the plain language of the statute to suggest that such a blinkered analysis of a project's benefits is required.

A contrary interpretation would lead to the absurd result that multijurisdictional projects such as this one—where the constituent parts must be built in separate jurisdictions to secure the intended benefit—will be stymied by the multiplicity of responsible agencies, each one prevented from acting until the others had. Mutually beneficial projects would be made impossible by the mere fact that it crossed jurisdictional borders.

Indeed, MCWD shrinks from advocating a bright-line rule that the only cognizable benefits, from the perspective of the responsible agency, are those that arise exclusively from the portion of the project overseen by the responsible agency. That is, MCWD argues that a case-specific factor—the City's denial of the slant wells—supports the conclusion that the County was constrained to relying on the benefits of only the desalination plant. We are not persuaded that the City's nonfinal denial of permitting prohibited the County from considering the benefits the Water Supply Project would provide, if complete.

44

As MCWD acknowledges, the California Coastal Commission is the agency with ultimate authority to decide whether the slant wells and associated coastal infrastructure will be permitted. And, unlike our deferential review of agency action under CEQA, the Coastal Commission's review is de novo. (See § 30621.) Consequently, the future of the Water Supply Project was no more doubtful when Cal-Am sought the County's approval than when it obtained the CPUC's approval—there was a proposed water source and Cal-Am was pursuing the permitting necessary to gain physical access to that water source.

This project, as it was presented to the County, is no different from any other in which permitting will be required from multiple jurisdictions. As explained by the CPUC, Cal-Am had a pathway to bring the project to fruition, but it had many steps ahead of it—both in terms of securing permitting from multiple agencies and establishing a right to the water it intended to pump. We express no opinion on the relative weight an agency should give the benefits of a completed project in this context—it is for public agencies to weigh the costs, benefits, and risks associated with their action and for the public to hold those agencies accountable. We hold only that the County was permitted to consider the water-related benefits that would be generated by the project as a whole, even though the County was responsible for only a portion of the project that would not, by itself, produce water. Accordingly, the County did not violate CEQA by considering the benefits of the completed project—that is, a desalination plant with a water source—in its analysis.

Given this legal conclusion, MCWD's substantial evidence challenge to the statement of overriding considerations fails. MCWD does not contend that the record lacks substantial evidence to support the conclusion that the Water Supply Project as a whole would produce the identified water-related benefits.

**5.** *Whether the County was Required to Discuss other Permitting Processes*

Even if the County was allowed to consider water-related benefits, MCWD contends that the County misled the public by failing to adequately discuss the need for a

45

water source to achieve the water-related benefits together with the extant uncertainty regarding Cal-Am's efforts to secure access to the proposed water source approved by the CPUC. Assuming the County violated CEQA by failing to adequately explain in the statement of overriding considerations the need to secure a water source outside of the County's permitting jurisdiction to complete the project, there was no prejudice.

We assume that the County's statement of overriding considerations was, in "a good-faith effort to inform the public," required to account for the uncertainty regarding Cal-Am's access to source water and the board's reason for granting approval in spite of that uncertainty. (See *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 718 (*Woodward Park*) ["We believe a statement of considerations, like an EIR, must make a good-faith effort to inform the public"].)[33] Even so, we are not persuaded that the failure to provide such a discussion was prejudicial.

"Although an agency's failure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a)), under CEQA 'there is no presumption that error is prejudicial' (§ 21005, subd. (b)). Insubstantial or merely technical omissions are not grounds for relief. [Citation.] 'A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463 [in the context of an inadequate EIR]; see also *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 942 [same];

---

[33] Notably, *Woodward Park* is distinguishable on its facts. There, the statement of overriding considerations was "dependent on assumptions contradicted by the EIR." (*Woodward Park*, *supra*, 150 Cal.App.4th at p. 720.) There is no similar issue here—the CPUC in its EIR did not assume that the Water Supply Project would fail due to an inability to secure necessary permits.

46

*Federation of Hillside & Canyons Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1207 [adoption of unnecessary statement of overriding considerations not prejudicial because it would not deprive the decisionmakers or the public of information necessary to meaningfully evaluate the project or otherwise result in prejudice].)

Without citing any analogous authority, MCWD contends that the County's "fail[ure] to adequately disclose that [its] approval could result in irreversible significant environmental impacts without producing a drop of potable water" effectively "deprived the public of relevant information regarding significant impacts and violated CEQA's substantive mandate [to reduce or avoid harm wherever possible,] by approving the desalination plant despite the County's authority to delay impacting the environment until the uncertainty of Cal-Am's water source could be resolved." In short, the asserted deficiency in the statement of overriding considerations is the absence of an express acknowledgement that the Water Supply Project and its projected overriding benefits might be doomed by the City's denial of permitting for slant wells if the Coastal Commission rejected Cal-Am's appeal of that denial, leaving the County with the sunk costs and environmental impacts of constructing a useless desalination plant.[34]

As a matter of informed agency decisionmaking, there is no basis on this record to doubt that the County was apprised of the status of Cal-Am's ongoing efforts to secure permitting for the components of the Water Supply Project, including Cal-Am's appeal of the City's denial of permitting for the slant wells.

At the outset, the County's consideration of the desalination plant was on MCWD's appeal from the decision of the Planning Commission, which contained a

---

[34] As a general matter, identification of a benefit to be derived from a project implicitly presumes the project's successful completion. We do not understand MCWD to be arguing that every potential failure risk must be acknowledged in the statement of overriding considerations, but rather that the risk of failure from denial of intake-well permitting is, if not sui generis, at least of a magnitude that required disclosure.

statement of overriding considerations including water-related benefits. A pre-hearing Board Report included a summary of MCWD's appellate contentions and staff responses thereto. The report acknowledged both that the County was asked to permit only the desalination plant, not the slant wells, and that the City had by that time denied permitting for the slant wells.

At the public hearing, MCWD stressed that "[t]he project's coastal development permit was denied by the City of Marina" and argued that it was therefore "completely speculative to believe that this project has any water whatsoever." To the same effect, a member of the public who self-identified as a "Cal-Am ratepayer from Monterey" argued that the board "could be voting for us ratepayers to pay for a desal plant that has no water source or one that has never been tried and may not work or will damage the Marina aquifer. No matter the results, Cal-Am makes a huge profit, and we, the ratepayers, get . . . increase[d] . . . rates."

In response to board questioning at the same hearing, Cal-Am stated that "[t]he Coastal Commission is currently considering the appeal of the slant well . . . denials" having recently concluded that "they . . . have jurisdiction to consider the appeal." Further, Cal-Am argued that desalination plant permitting needed to go forward without delay to meet the deadline set forth in the extant cease and desist order because the desalination plant was the project component that would take the longest to construct.

The supervisors were well aware of MCWD's concerns. For example, Supervisor Mary L. Adams, one of the two supervisors who voted against granting the Permit, made an unsuccessful motion to continue the matter until after the Coastal Commission made a "final decision" on whether a coastal development permit would be granted. While she had "no reservation that desal is going to be needed for our future," she also expressed concern that "Cal-Am ratepayers [would be] saddled with the cost of building a desal plant that isn't going to be able to treat water because the source water isn't secured." Each of the three Supervisors who voted to grant the Permit explained at the public

48

hearing their reasons for favoring prompt action notwithstanding the risk of project failure.[35]

As a matter of public participation, we likewise see no basis for concern that the ultimate omission of an express acknowledgement from the statement of overriding considerations dampened public participation in the decisionmaking process. The risk identified by MCWD—that the project could fail and that the effect of failure would include the irreversible significant environmental costs associated with building a desalination plant—was aired at the public hearing by MCWD itself before the County rendered its decision. As MCWD put it in its appellate brief: "Ignoring pleas from the public, multiple agencies, and even two Board members to at least postpone a decision until the Coastal Commission considers Cal-Am's appeal of the City of Marina's denial of the slant wells, the Board approved the desalination facility in [a] split (3-2) vote." Thus, there was undisputedly informed public participation before Monterey's board made an informed decision.

As a matter of public accountability, we are not persuaded that the omission of the issue from the statement of overriding considerations impacted the public's ability to hold the County's elected officials accountable for their votes. The overriding considerations that motivated the County to approve the construction of a desalination plant are plain, as is their dependence on the availability of source water. MCWD's fundamental contention that the County made a reckless gamble likewise depends on the City's and

_____

[35] Among the reasons articulated at the hearing were the pressing need to generate a greater water supply to support the region; the belief that a desalination plant would inevitably be necessary to meet that need; the belief that the construction-related work that would actually occur while other legal and regulatory disputes were resolved would be somewhat limited; the suitability of the proposed site on unused land near a landfill and industrial activities, including a water treatment facility; the adoption of Condition 22; in the view of one of the supervisors who also was on Monterey One Water's board, Monterey One Water's board was "dragged into" investing in expansion even though "most of us" were not in favor of it "but we were ordered to be"; and serious concern about the adequacy of source water for expansion of Pure Water Monterey.

the Coastal Commission's public permitting processes, as MCWD observes was "plea[ded]" at the County's public hearing. Moreover, the County's inclusion in the same order of Condition 22—triggered if operation of the desalination plant became "permanently infeasible due to a lack of a water source"—makes plain that the County was aware that a water source was less than certain. Voters dismayed by the County's approving construction of a potentially infeasible desalination plant will know where accountability lies.

MCWD's reliance on *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022 (*Village Laguna*) is misplaced. There, Orange County approved an amendment to its general plan to build a new city of possibly 60,000 persons, despite significant environmental effects identified in the EIR. (*Id.* at pp. 1026, 1032.) Orange County's explanation for its failure to adopt mitigation measures or alternatives was deficient in that it did not disclose why those measures or alternatives were infeasible. (*Id.* at pp. 1032-1035.) The absence of an " 'analytic route the . . . agency traveled from evidence to action' " left the court to conclude that "it is almost as if no EIR was prepared at all. . . . [T]here is no evidence that the board ever considered any EIR alternative to the project except the 'No Development' alternative." (*Id.* at p. 1035.) Here, in contrast, we are presented with a statement of overriding considerations that fulfills its most essential purpose—to apprise the reader of the benefits, supported by substantial evidence, that the public agency believed justified a decision to undertake the project in spite of its acknowledged adverse environmental impacts. (See *Cherry Valley*, *supra*, 190 Cal.App.4th at pp. 356-359.) Moreover, nothing in *Village Laguna* addresses prejudice in the context of a deficiency in a statement of overriding considerations, much less suggests that an agency commits a prejudicial violation of CEQA by failing to acknowledge that a project's benefits will not be obtained if all of its components are not completed or by failing to address particular stumbling blocks pertaining to the completion of particular components. (See, generally,

50

*Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1182 [distinguishing between statement of overriding considerations and findings relating to feasibility of project alternatives].)

CEQA provides a framework by which a public agency, in evaluating a proposed development, shall be fully informed by relevant environmental considerations and public comment. It does not, however, authorize us to substitute our own judgment for the agency's otherwise lawful determination, however closely divided the vote by which it reached its decision.

**B.**      ***General Plan***

MCWD asserts that the County violated the state Planning and Zoning Law (Gov. Code, § 65000 et seq.) by approving a project that was inconsistent with its general plan. MCWD contends that the County erred by:  (1) finding, without substantial evidence in the record, that the desalination plant is exempt from a requirement to demonstrate a long-term sustainable water supply;[36] and (2) failing to expressly discuss a handful of general plan policies that "were potentially inconsistent with the desalination plant" in issuing its decision.  We reject both contentions.

     **1.**      ***Standard of Review***

"Each city and county in California must have a general plan for its physical development (Gov. Code, § 65300) and local land use decisions . . . must be consistent with it."  (*Save Lafayette v. City of Lafayette* (2022) 85 Cal.App.5th 842, 850; see also *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 535-536.) " ' "[T]he propriety of virtually any local decision affecting land use and development

---

[36] If the exemption is inapplicable, MCWD contends that Monterey could not support a finding that the desalination plant had a long-term sustainable water supply until Cal-Am gained access to a water source that it had demonstrated water rights to extract.  Because we uphold Monterey's determination that the exemption applied, we do not decide whether the provision could be satisfied.

51

depends upon consistency with the applicable general plan and its elements." ' "
(*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 153
(*Orange*).)  " ' "An action, program, or project is consistent with the general plan if,
considering all its aspects, it will further the objectives of the general plan and not
obstruct their attainment." ' " (*Ibid*.; see also *Save Livermore*, *supra*,  87 Cal.App.5th at
p.  1124 [" 'A given project need not be in perfect conformity with each and every
general plan policy.' "].)

A planning agency's determination whether a particular development is consistent
with its general plan "is fundamentally adjudicatory.  In such circumstances, a
consistency determination is entitled to deference as an extension of a planning agency's
' "unique competence to interpret [its] policies when applying them in its adjudicatory
capacity." ' " (*Orange*, *supra*, 2 Cal.5th at p. 155.)  Our role is accordingly limited:  "We
decide merely whether [local] officials 'considered the applicable policies and the extent
to which the proposed project conformed with those policies, whether the city officials
made appropriate findings on this issue, and whether those findings are supported by
substantial evidence.' " (*Save Livermore*, *supra*, 87 Cal.App.5th at p. 1124.)  "Reviewing
courts *must defer* to a procedurally proper consistency finding unless no reasonable
person could have reached the same conclusion." (*Orange*, *supra*, 2 Cal.5th at p. 155
(italics added).)  " 'The party challenging [an agency's] determination of general plan
consistency has the burden to show why, based on all of the evidence in the record, the
determination was unreasonable.' " (*Clews Land & Livestock, LLC v. City of San Diego*
(2017) 19 Cal.App.5th 161, 201 (*Clews*).)

### 2.     *The Public Services Element of the County's General Plan*

"The Public Services Element addresses critical infrastructure and service issues,
including water supply and conservation" and "water quality," among other things.  As
explained in the County's general plan, "[w]ater is necessary for domestic, industrial and
agricultural use, recreational uses, as well as sustaining fish and wildlife habitats."

52

"Groundwater is the principal source of water in the County, accounting for more than 80% of the total water use. . . . Increases in groundwater pumping practices have resulted in overdrafting and have caused salt water intrusion in the Pajaro and Salinas River groundwater basins."

Goal PS-3 of the general plan is: "Ensure that new development is assured a long-term sustainable water supply." The general plan includes fifteen policies in furtherance of that goal.

Policy PS-3.1 provides, subject to express exceptions, that "new development for which a discretionary permit is required, and that will use or require the use of water, shall be prohibited without proof, based on specific findings and supported evidence, that there is a long-term, sustainable water supply, both in quality and quantity to serve the development."[37] One express exception is for "specified development (a list to be developed by ordinance) designed to provide: a) public infrastructure or b) private infrastructure that provides critical or necessary services to the public, and that will have a minor or insubstantial net use of water (e.g. water facilities, wastewater treatment facilities, road construction projects, recycling or solid waste transfer facilities)."

Policy PS-3.2 requires the development by ordinance of "[s]pecific criteria for proof of a Long Term Sustainable Water Supply and an Adequate Water Supply System for new development requiring a discretionary permit." "A determination of Long Term Sustainable Water Supply shall be made upon the advice of the General Manager of the Water Resources Agency."

_____

[37] MCWD assumes that "long-term sustainable water supply, both in quality and quantity to serve the development," in this context includes a supply of seawater. We question this interpretation. We note the Water Board opinion that Cal-Am need not establish a water right to obtain seawater, even if that seawater is pumped from an aquifer.

53

### 3.     *Exemption from Policy PS-3.1*

The County determined the project is exempt from Policy PS-3.1.  It reasoned that the desalination plant "will provide water for Cal[-]Am's Monterey District service area and is necessary because Cal[-]Am must replace its existing diversions of water from the Carmel River in excess of Cal[-]Am's legal entitlement . . . .  The project proposes an insubstantial new [*sic*] use of water by desalinating sea water and returning groundwater component that is used to agricultural users in the Salinas Valley Groundwater Basin in lieu of an equal amount of groundwater pumping."  Thus, the County applied the exemption to Policy PS-3.1 on the grounds that the desalination plant was private infrastructure that provided necessary services and will have a minor or insubstantial net use of water.

MCWD contends that the County cannot invoke the exemption because:  (1) the County has never specified by ordinance the developments to be covered by the exception; (2) the project is not critical or necessary; and (3) the project will use a substantial amount of water.  We reject each of these contentions in turn.

First, although the general plan unambiguously directs the County to identify by ordinance the types of developments exempt from Policy PS-3.1, it does not prescribe nullification of the exemption scheme as the consequence of the County's failure to develop a list.  MCWD's construction would be inconsistent with the plain intent of the general plan.  Read in the context of the various implementing policies, Goal PS-3 is to avoid overtaxing the County's water resources through unsustainable growth.[38]  In implementing that goal, policy PS-3.1 identifies "water facilities" as at least potentially exempt from the required identification of a long-term, sustainable water supply.[39]

---

[38] As one example, policy PS-3.7 expressly identifies "[d]esalination" as a potential strategy that may be explored to "eliminate overdraft of water basins."

[39] MCWD argues that the express exemption for "desalination project[s]" in policy PS-3.5 "implies that desalination facilities were intentionally excluded" from policy PS-

Accordingly, provided water facilities are critical or necessary to the public and will have a minor or insubstantial net use of water, the drafters of the general plan did not intend to require findings regarding a long-term, sustainable water supply as a condition for discretionary approval. This is consistent with the apparent purpose identified above—development that facilitates the generation, rather than expenditure, of water is unlikely to pose a risk of overtaxing the County's water resources.

Second, there is no apparent dispute that obtaining an increased water supply in the region is critical or necessary. MCWD agrees that the Salinas Basin is "critically overdrafted." Indeed, MCWD's prior involvement in the Regional Desalination Project and its opposition to Cal-Am's effort to void the agreements essential to that precursor to the Water Supply Project would make it difficult for MCWD to argue otherwise. MCWD's argument here recapitulates its assertion that Cal-Am's demand can be met in other ways—such as through Pure Water Monterey expansion—or that the desalination plant will, without a water source, be useless. But, as we have explained, substantial evidence supported the County's conclusion that regional water demand necessitated the desalination plant as sized and that expansion of Pure Water Monterey was not a feasible alternative. Accordingly, there was substantial evidence to support the conclusion that the desalination plant, as a central component of the Water Supply Project, was necessary to meet a critical need.

Third, MCWD's contention that the desalination plant will consume a substantial amount of water is based on the presumption that the source water to be drawn from the aquifer is otherwise potable. As MCWD puts it: "[T]he desalination plant will operate at an overall recovery rate of only 42 percent. This means that the desalination plant would

3.1's exceptions. But policy PS-3.5 deals with construction of "new wells in areas of saltwater intrusion;" it is unsurprising that desalination projects, and only desalination projects, are exempt. Policy PS-3.1 applies more generically to "water facilities," apparently obviating the need to specifically identify desalination projects.

need to process more than 15 mgd (or over 16,000 afy) of groundwater in order to produce 6.4 mgd (or approximately 7,160 afy) of desalinated water. . . . The County's position that a net loss of 8.7 mgd is 'minor or insubstantial' is even more preposterous considering the [Salinas Basin] is already critically overdrafted." To be sure, the volume of potable water yielded by the desalination process is only a fraction of the intake. But the final EIR reflected that the water to be processed would consist primarily of otherwise unusable seawater. Indeed, the fundamental premise of the project is that the wells will draw predominantly unusable seawater and produce usable water, while also restoring to the Salinas Basin desalinated water commensurate with the volume of usable water drawn into the intake wells. To the extent this use of water—turning seawater intrusion into potable water plus brine to be discharged to the ocean—can be understood to constitute a net use of water, we are unable to find that no reasonable person could have reached the same conclusion as the County. Because substantial evidence supported the County's determination that the predominant water source would be seawater that had intruded into the aquifers, the County was likewise entitled to conclude that the desalination plant's net use of water would be minor or insubstantial.

### 4.    *Consistency with Other General Plan Policies*

The County found that the "Project, as conditioned, is consistent with the applicable plans and policies which designate this area as appropriate for development." In support of that finding, the County stated that "[n]o conflicts were found to exist" between the project and the general plan, among other things. Moreover, the County made specific findings as to several general plan policies, apparently because those policies were raised in the appeals it was addressing.

In the present appeal, MCWD's contention seems to be that the County was required to specifically discuss each general plan policy as to which the CPUC EIR

56

identified a potential inconsistency.[40]  This includes several policies that were not addressed in the County's written decision:  S-7.2, S-7.9, OS-4.1, OS-4.2, OS-4.3, OS-5.1, OS-5.2, OS-5.4, OS-5.6, OS-5.16, and OS-5.25.  But MCWD does not dispute that the CPUC EIR also identified remedial mitigation measures that would resolve any concern as to each of these policies, or that the County adopted those mitigation measures.  That being the case, MCWD has articulated no basis for continuing concern regarding the project's consistency with the specified policies.  MCWD has therefore not carried its burden " 'to show why, based on all of the evidence in the record, the determination was unreasonable.' [Citation.]" (*Clews*, *supra*, 19 Cal.App.5th at p. 201.)

### III.    DISPOSITION

The April 29, 2021 judgment is reversed.  On remand, the trial court is directed to (1) vacate its order granting the petition for writ of mandate and complaint for declaratory relief; and (2) enter a new order and judgment denying the petition for writ of mandate and complaint for declaratory relief in its entirety.  Appellants and cross-respondents shall recover their costs on appeal.

---

[40] MCWD is, in effect, challenging the sufficiency of the explanation for the County's finding that the project does not conflict with any policies in its general plan. MCWD has identified potential conflicts as to only policies that were flagged in the CPUC EIR, and only on the basis that a potential conflict was flagged by the CPUC. MCWD does not itself contend that the project is inconsistent with those policies. Instead, it argues that the County had to provide a more complete explanation of its consistency determination.





_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

BAMATTRE-MANOUKIAN, J.

*Marina Coast Water District v. County of Monterey et al.*
H049170 & H049146

60

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MARINA COAST WATER DISTRICT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF MONTEREY et al., <br><br> Defendants and Appellants; <br><br> CALIFORNIA-AMERICAN WATER COMPANY, <br><br> Real Party in Interest and Appellant. | H049146 & H049170 <br> (Monterey County <br> Super. Ct. No. 19CV003305) <br><br> ORDER MODIFYING OPINION, DENYING REHEARING, AND CERTIFYING OPINION FOR PARTIAL PUBLICATION <br><br> NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on September 8, 2023, be modified as follows:

1. On page 14, the sentence starting on line 13, with "In March 2019," and ending on line 15 with "groundwater depletion." is deleted and the following sentence is inserted in its place:

   In March 2019, the City denied the request.

2. On page 18, line 2 of footnote 18, delete ", without citation," so the sentence reads:

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Section II.B.

To that end, MCWD claims that when the City denied Cal-Am permitting for the slant wells it was presented with relevant information that had not been submitted to the CPUC.

3. On page 32, line 15, after the word "figures" add as footnote 26 the following footnote, which will require renumbering of all subsequent footnotes:

[26] In a comment letter and a notice of appeal, MCWD stated that "Cal-Am's most recent demand numbers (available at Monterey Peninsula Water Supply Project <https://www.watersupplyproject.org/system-delivery>) show demand within Cal-Am's service area has remained flat and has not increased as a result of the fully recovered economy as the Final EIR assumed." But it is not apparent from the linked web page what information was posted there during the time period relevant to this appeal, as to actual demand figures at any relevant time.

4. On page 38, line 9, after the word "[EIR]." " add as footnote 31 the following footnote, which will require renumbering of all subsequent footnotes:

[31] In the final EIR, the CPUC stated that until "an expanded [Pure Water Monterey] project is proposed . . . , and unless environmental documentation is prepared and the CEQA process is completed, the alternative is not reasonably foreseeable and is considered speculative at this time." While our analysis does not depend on this excerpt, it is consistent with our analysis insofar as not all of the conditions the CPUC then forecast as necessary to alter its foreseeability analysis had occurred before the time the County acted.

5. On page 52, line 9 of the first full paragraph, after "at p. 1124" insert the following "; see also *United Neighborhoods for Los Angeles v. City of Los Angeles* (2023) 93 Cal.App.5th 1074, 1093 [agency's "applicability finding must be supported by substantial evidence"]" so the citation reads as follow:

(*Save Livermore*, *supra*, 87 Cal.App.5th at p. 1124; see also *United Neighborhoods for Los Angeles v. City of Los Angeles* (2023) 93 Cal.App.5th 1074, 1093 [agency's "applicability finding must be supported by substantial evidence"].)

6. On page 56, line 12, after the words "use of water" delete the text starting with ", we are unable" and ending with "the County" and the following is inserted in its place "at all, there is substantial evidence to support the County's

determination that the plant will have a minor or insubstantial net use of water" so the sentence reads as follows:

To the extent this use of water—turning seawater intrusion into potable water plus brine to be discharged to the ocean—can be understood to constitute a net use of water at all, there is substantial evidence to support the County's determination that the plant will have a minor or insubstantial net use of water.

7. On page 56, line 13 the word "likewise" is deleted so that the sentence reads as follows:

Because substantial evidence supported the County's determination that the predominant water source would be seawater that had intruded into the aquifers, the County was entitled to conclude that the desalination plant's net use of water would be minor or insubstantial.

There is no change in judgment.

Respondent and Cross-Appellant's petition for rehearing is denied.

The opinion in the above-entitled matter filed on September 8, 2023, was not certified for publication in the Official Reports. For good cause it now appears that, with the exception of Section II.B, the opinion should be published in the Official Reports, and it is so ordered.

_____

LIE, J.


_____

GREENWOOD, P.J.


_____

BAMATTRE-MANOUKIAN, J.


*Marina Coast Water District v. County of Monterey et al.*
H049170 & H049146

Trial Court:                                    Monterey County Superior Court
                                                Superior Court No.:  19CV003305


Trial Judge:                                    The Honorable Lydia Villarreal


Attorneys for Plaintiff and Appellant           Remy Moose Manley
Marina Coast Water District.:                   Howard F. Wilkins III
                                                Christopher L. Stiles
                                                Christina L. Berglund


Attorneys for Defendants and                    Office of the County Counsel
Appellants County of Monterey et al.:           Leslie J. Girard
                                                Robert Brayer


Attorneys for Real Party in Interest and        Latham & Watkins
Appellant California-American Water             Duncan Joseph Moore
Company:                                        Winston P. Stromberg
                                                Lucas I. Quass
                                                Natalie C. Rogers

*Marina Coast Water District v. County of Monterey et al.*
H049170 & H049146